UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

ROBBIE MITCHELL,

                              Plaintiff,

                                                          5:14-CV-00701
v.                                                        (TWD)

SUNY UPSTATE MEDICAL UNIVERSITY

                              Defendant.
_____


APPEARANCES:                          OF COUNSEL:

JAMES D. HARTT, ESQ.
Attorney for Plaintiff
70 Linden Oaks
Third Floor
Rochester, New York 14625

HON. ERIC T. SCHNEIDERMAN            AIMEE M. PAQUETTE, ESQ
Attorney General for the State of New York    Assistant Attorney General
Attorney for Defendant
Syracuse Regional Office
615 Erie Boulevard West
Suite 102
Syracuse, New York 13204


**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## DECISION AND ORDER

## I.      INTRODUCTION

        Plaintiff Robbie Mitchell commenced this action against Defendant SUNY Upstate

Medical Center ("Upstate"), alleging violation of Title VII of the Civil Rights Act of 1964 ("Title

VII"), 42 U.S.C. § 2000e *et seq.*  (Dkt. No. 1.)  Defendant moved to dismiss under Rule 12 of the

Federal Rules of Civil Procedure on *res judicata* and collateral estoppel grounds, based upon the dismissal of Plaintiff's prior Title VII action. (Dkt. No. 7.) The motion was denied by the Hon. Thomas J. McAvoy, Senior District Judge, on the grounds that the claims being asserted by Plaintiff were not actually litigated and decided in the prior action.[1] (Dkt. No. 13 at 4.[2]) Plaintiff thereafter filed a first amended complaint (Dkt. No. 23), and discovery ensued. The matter is now before the Court on Defendant's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 37.) Plaintiff has filed a response to the motion. (Dkt. No. 43.) For reasons explained below, Defendant's motion is granted.

## II.    BACKGROUND

Plaintiff is an African American male who was hired to work at Upstate on September 3, 2009, and continued as an employee until September 25, 2015. (Dkt. No. 37-22 at ¶¶ 6, 153.[3]) According to Renee J. Johnson ("Johnson"), Senior Employee/Labor Relations Representative in the Human Resources Department at Upstate, Plaintiff was hired as a Supply Assistant in the Central Equipment Services Department ("Equipment"). *Id.* In his response to Defendant's material statement of facts, submitted in the form of an affidavit, Plaintiff contends he was hired as a Supply Assistant in the Central Distribution Service Department ("Distribution"). (Dkt. No. 43-2 at ¶ 2.) Plaintiff also testified at his deposition that he was hired to work in Distribution and

---

[1] The parties subsequently consented to the authority of this Court to conduct all proceedings in the case in accordance with 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, and Judge McAvoy filed a Reference Order on July 7, 2016. (Dkt. No. 36.)

[2] Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.

[3] Paragraph references are used where the referenced document contains consecutively numbered paragraphs.

worked in Distribution from the time he was hired by Upstate in September 2009 through August 2, 2103, when he was moved to supply assistant in Equipment.[4]  (Dkt. No. 37-21 at 27-29, 33.)

A.     **August 24, 2012, Notice of Discipline, Interrogation, and Grievance Arbitration**

While employed at Upstate, Plaintiff was represented by the Civil Service Employees Association ("CSEA") and subject to the provisions of the contract between New York State and the CSEA Administrative Services Unit ("CSEA contract").  (Dkt. Nos. 37-21 at 19; 37-22 at ¶¶ 8-9; 37-23.)  The employee disciplinary procedure set forth in Article 33 of the CSEA contract provides for issuance of a Notice of Discipline ("NOD"):

**§ 33.3  Disciplinary Procedure**

**(a)  Notice of Discipline**

(1)  Where the appointing authority or the appointing authority's designee seeks the imposition of a written reprimand, suspension without pay, a fine not to exceed two weeks' lost pay, loss of accrued leave credits, reduction in grade, or dismissal from service, notice of such discipline shall be made in writing and served upon the employee.  Discipline shall be imposed only for incompetency or misconduct.  The specific acts for which discipline is being imposed and the penalty proposed shall be specified in the notice. The notice of discipline shall contain a detailed description of the alleged acts and conduct including reference to dates, times, and places.

_____

[4]  Plaintiff's assertion that he was hired to work in Distribution appears to find support in his Upstate Appointment Request (Classified Service), dated September 1, 2009, which identified the position for which the appointment request was being made as a Supply Assistant SG004 in Central  Distribution Services (Case No. 5:13-CV-00823 (N.D.N.Y.), Dkt. No. 14 at 8), and his Upstate Notice of Classified Service, dated September 18, 2009, which also identifies the position for which he was hired as Supply Assistant SG004 in Central Distribution Service. _Id_. at 9.  However, a New Employee Acknowledgment of Day Two Orientation Attendance, dated September 4, 2009, which appears to have been signed by Plaintiff, indicates he attended orientation for Supply Assistant in Equipment.  _Id_. at 10.

(Dkt. No. 37-23 at 51.)

Plaintiff was issued an NOD shortly before the third anniversary of his employment at

Upstate.  (Dkt. No. 37-30.)   The August 24, 2012, NOD informed Plaintiff that Upstate proposed

terminating his employment for incompetence/misconduct identified as:

> 1.   On or about 7/1/12, you inappropriately placed a hand
>      written note in the locker of your female co-worker, in the
>      Central Distribution Department, which was written in red
>      ink, and stated, Fuck you Bitch I got that Pussy!
>
> 2.   On or about 7/1/12, you inappropriately used sexually
>      explicit, foul and abusive communication in the workplace,
>      when you placed the written note, as referenced in charge
>      #1 above, in the locker of your female co-worker.
>
> 3.   On 7/3/12, you caused a disruption to the Central
>      Distribution Department when your co-worker found the
>      note, as referenced above in charge #1, was furious that
>      someone would put such a note in her locker; starting
>      investigating on her own by checking the handwriting in the
>      call-in book to see who was writing with red ink; reported it
>      to the secretary (J.F.); and reported it to a supervisor.
>      (Y.G.).[5]

*Id*. at 1.  Plaintiff was informed in the NOD that the proposed penalty would take effect on

September 7, 2012, and that prior to the exhaustion or institution of the grievance procedure set

forth in Article 33 of the CSEA contract by Plaintiff, he was being suspended without pay,

effective immediately because it had been determined that there was probable cause to believe

---

[5]  Plaintiff testified at his deposition that his prior race discrimination claim, arising out of
the August 12, 2012, NOD and accompanying suspension are not part of this lawsuit.  (Dkt. No.
37-21 at 30.)  The first claim covered by this action has been identified by Plaintiff as being
reassigned to a different department when he returned to work following a 364 day suspension
imposed with respect to the August 12, 2012, NOD. (Dkt. Nos. 23 at ¶ 22; 37-21 at 37-21 at 29;
43 at ¶ 9.)

his continued presence represented "a potential danger to persons or property or would severely interfere with operations."  *Id.*

Plaintiff had initially been placed on paid administrative leave on July 5, 2012, as a result of the note.  (Dkt. No. 37-22 at ¶ 29.)  On July 17, 2012, prior to issuance of the NOD, Johnson had conducted a disciplinary interrogation regarding the note in accordance with § 33.2 of the CSEA contract.  (Dkt. Nos.  37-23 at 99; 37-32.)  During the interrogation, Plaintiff admitted placing the note in his co-worker's locker but denied that the note was intended for the co-worker.  (Dkt. No. 37-32 at 2-3.)  According to Plaintiff, he mistakenly put the note, intended for a friend of his, in the locker instead of the note he was writing the co-worker.  *Id.* at 3-4.  It was also noted by Plaintiff's representative during the interrogation and acknowledged by Johnson that the co-worker had signed a statement saying she had discussed the note with Plaintiff and understood the mistake and was okay with it.  *Id.*

After receiving the NOD, Plaintiff filed an August 27, 2012, disciplinary grievance pursuant to § 33.3(c) of the CSEA contract (Dkt. No. 37-23 at 52), requesting that Upstate drop all charges because the charges were not completely factual in that he had statements from his co-worker and the person for whom the note was intended.  (Dkt. No. 37-33.)  Following the disciplinary arbitration held on the grievance (*see* Dkt. No. 37-23 at 55-56), the Arbitrator, who found Plaintiff's explanation regarding the note to be not credible, concluded in a June 25, 2013, arbitration award that: (1) Plaintiff was guilty of the charges in the NOD; (2) Plaintiff's suspension was not proper under Article 33.3(g)(1) because Upstate failed to offer proof why Plaintiff's continued presence would cause danger or disruption at work, particularly since once the co-worker learned that Plaintiff had likely put the note in her locker, all disruption ended; and

(3) the punishment of termination was too severe, "[g]iven the apparent work environment and tolerances in the Department and the fact that this is Grievant's first offence." (Dkt. No. 37-34 at 7-10.) The Arbitrator directed that Plaintiff's penalty be his disciplinary suspension without pay until his return to work upon receipt of the arbitration award.[6] *Id.* at 10.

### B. Equal Employment Opportunity Commission ("EEOC") Charge, Filed February 11, 2013, and Plaintiff's Initial Title VII Discrimination Lawsuit

Plaintiff filed a charge of discrimination against Upstate with the EEOC on February 11, 2013, prior to the issuance of the arbitration award. (Dkt. No. 37-37.) Plaintiff claimed discrimination based upon race and retaliation. *Id.* Plaintiff complained specifically of: (1) his June 5, 2012, suspension with pay by Upstate Director of Equipment and Supply Logistics, Donald Sadeckas ("Sadeckas"); and (2) being charged with incompetency and misconduct and suspended without pay on or about August 28, 2012. *Id.* Plaintiff complained that a white individual in a similar situation was not treated in the same manner, and he expressed a belief that he was disciplined in retaliation for filing a grievance on July 6, 2011, based on his race in violation of Title VII. *Id.*

The EEOC issued a right to sue letter on April 17, 2013 (Dkt. No. 37-38), and Plaintiff thereafter commenced a Title VII discrimination lawsuit against Upstate, Johnson, and Sadeckas. (Case No. 5:13-CV-00823 (N.D.N.Y.) ("Action 1"), Dkt. No. 1.) Plaintiff alleged race discrimination in terminating his employment, failing to promote, unequal terms and conditions of employment, and retaliation. (Action 1, Dkt. No. 1 at 2.) The sole allegation of wrongdoing

---

[6] Plaintiff filed for unemployment insurance benefits as a result of his suspension without pay, and the Unemployment Insurance Appeal Board issued a decision on February 20, 2013, finding Plaintiff entitled to benefits. (Dkt. Nos. 37-2 at ¶ 40; 37-35.)

in the complaint was that "Donald M. Sadeckas wrongful conduct was he committed Race Discrimination. Renee J. Johnson wrongful conduct was she committed conspiracy of Race Discrimination. Mr. Sadeckas and Ms. Johnson both do not want African-Americans to better themselves. When it comes to choices, procedures, promote and discipline, It's not giving out equally." (Action 1, Dkt. No. 1 at 3.) Defendants moved to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure (Action 1, Dkt. No. 11-1.) Plaintiff submitted an affirmation and exhibits related to the subject of the August 24, 2012, NOD and his year long suspension, along with another NOD that had been issued after commencement of the discrimination suit. (Action 1, Dkt. Nos. 14 and 15 at 4-5.)

The District Court granted Defendants' motion to dismiss for failure to state a claim and gave Plaintiff thirty days to file an amended complaint. (Action 1, Dkt. No 15 at 8.) According to the Clerk's docket in the case, Plaintiff did not file an amended complaint.

### C. Plaintiff's Return to Work Following the 364 Day Suspension, Reassignment to Equipment, and the August 2, 2013, NOD

Following issuance of the June 25, 2013, arbitration award, Sadeckas attempted unsuccessfully to reach Plaintiff by telephone on June 27 and 28, 2013, to arrange for his return to work, and left messages. (Dkt. No. 37-43.) Plaintiff did not receive the messages because the telephone number which Sadeckas would have called was disconnected at the time. (Dkt. Nos. 37-21 at 47; 43-2 at ¶ 55.) Plaintiff had not provided Upstate with a new number. (Dkt. No. 37-21 at 47.)

Sadeckas sent Plaintiff a letter by certified mail on June 28, 2013, stating:

> Pursuant to the Award of Arbitrator Judith LaManna dated
> 6/25/13, I have attempted to reach you to arrange for your return to

work.  On 6/27/13 and 6/28/13, I left you telephone messages on
your phone number of record stating to contact me at [blacked out].
However, you failed to return my phone calls.

Therefore, this letter is to inform you that your absence as of
6/27/13 is without authorization and you may be subject to
disciplinary action, up to and including termination of your
employment.

Further, you are hereby directed to contact me directly at [blacked
out] no later than 7/5/13, to discuss your employment status.

(Dkt. No. 37-41.)

Plaintiff received Sadeckas' letter on Saturday June 30, 2013, and according to Plaintiff,
he telephoned Sadeckas on the following Monday, July 1, 2013.  (Dkt. Nos. 37-21 at 45; 43-2 at
¶¶ 57-58.)  An exchange of emails between Sadeckas and Johnson on July 2, 2013, indicates that
Plaintiff called Sadeckas on July 2, 2013.  (Dkt. 37-42.)  When they spoke, Sadeckas told
Plaintiff to come back to work that day, and Plaintiff responded that could not happen, and he
would return on July 4, 2013, the beginning of a pay period.  (Dkt. Nos. 37-21 at 45; 37-42.)
Plaintiff could not return until July 4th because he had to find a babysitter.  (Dkt. No. 37-21 at
45.)

According to Sadeckas, he advised Plaintiff during their telephone conversation that any
days he did not come into work would be considered unauthorized and could result in
disciplinary action.  (Dkt. Nos. 37-22 at ¶ 60; 37-83 at ¶ 56.)  While Plaintiff affirmed that to be
true in his affidavit in response to Defendant's statement of material facts (Dkt. Nos. 37-83 at ¶
56; 43-2 at ¶ 56), he testified at his deposition that Sadeckas did not tell him during their
telephone conversation that the days he was not working would be unexcused absences, and that
he was not aware of it until he returned to work.  (Dkt. No. 37-21 at 46.)

During the phone call between Sadeckas and Plaintiff, Sadeckas told Plaintiff he would

be working in Equipment on his return. (Dkt. No. 37-42.) In the July 2, 2013, email exchange

between Sadeckas and Johnson, Johnson asked Sadeckas about Plaintiff's response to learning

that he was being moved to Equipment, and Sadeckas indicated that Plaintiff had said nothing.

(Dkt. No. 37-42.) Plaintiff did not say anything about the transfer because he believed Sadeckas'

mind was made up, and there was no need to argue on the phone. (Dkt. 37-21 at 31-32.) The

parties do not dispute that Plaintiff's work schedule, grade, and pay remained the same in

Equipment.[7] *Id*. at 34. In his first amended complaint, Plaintiff nonetheless alleges that placing

him in Equipment was tantamount to a demotion, that Equipment was objectively less desirable

than his former position, and that the transfer to Equipment was the first of several retaliatory

acts for having filed discrimination complaints against Upstate. (Dkt. No. 23 at ¶¶ 21-22.)

Plaintiff also alleges that he did not receive adequate training for the new position and was set up

to fail, and that he was not given the thirty day notice he was entitled to under the CSEA contract

before being moved into a new department. *Id*. at ¶¶ 23-25.

On August 2, 2013, Plaintiff received a NOD relating to time and attendance. (Dkt. No.

37-40.) The NOD stated:

> In accordance with the Disciplinary Procedure, Article 33, of the
> current Agreement between New York State and CSEA, you are
> hereby informed that we propose to issue you a fine equivalent to a
> three (3) week suspension without pay for incompetence/
> misconduct as indicated below:

---

[7] Plaintiff's supply assistant position in Distribution was grade four, and he was paid in
accordance with that grade, although he contends, without evidence, he was doing grade seven
work. (Dkt. No. 37-21 at 32.) Plaintiff's supply assistant position in Equipment was also grade
four, and Plaintiff was paid as a grade four through the remainder of his employment at Upstate.
*Id*.

**Dates Absent:**

06/28/13*
06/29/13*
06/30/13*
07/02/13*
07/03/13*

**\*Unauthorized Absence**

The proposed penalty shall take effect on August 16, 2013.
*Id*.

Plaintiff filed a grievance pursuant to Article 33.5 of the CSEA contract in response to the

NOD. (Dkt. Nos. 37-21 at 50; 37-44.) The grievance indicated that Plaintiff disagreed with the

NOD because it was unclear to him when he was to report back to work, and that he had spoken

to his boss on July 1st, and it was his understanding that he was to report to work on July 4,

2013. (Dkt. No. 37-44.) Plaintiff prevailed on his grievance. (Dkt. No. 37-45 at 1-3.) The

November 3, 2013, decision by the permanent umpire at the time and attendance disciplinary

hearing on the grievance noted the Union's position that it was Plaintiff's first time and

attendance discipline; that there was confusion as to the start date for Plaintiff to return to work;

and that Plaintiff had explained at the hearing that he had been providing childcare to his children

during his suspension and had to make other arrangements. *Id*. at 2. The permanent umpire

noted, however, that Plaintiff had not given any reason to Sadeckas for his delayed return to work

when they spoke on the phone. *Id*.

The permanent umpire, in ruling in Plaintiff's favor, noted that the arbitration award had

not quantified the length of the suspension imposed as the penalty and tied the terminus of the

suspension to "receipt of this award," without stating whether it was Plaintiff's or Upstate's

receipt.  *Id*. at 3.  The umpire further noted that Sadeckas' June 28, 2013, letter directed Plaintiff to call no later than July 5, 2013, and that Plaintiff had complied with the directive by calling Sadeckas on July 1st.  *Id.*  In addition, the umpire reasoned that '[g]iven the length of the Article 33 disciplinary suspension and given that there are no restrictions imposed on an individual who is suspended without pay pending resolution of a disciplinary arbitration, it is not unreasonable that Grievant might need a day or two to get himself in a position to return to work upon receiving the Arbitration Award imposing a suspension rather than termination of his employment."  *Id*.

In her decision, the umpire found that the period from June 28 through July 3, 2013, was part of the suspension served pursuant to the Article 33 discipline and Arbitrator's June 25, 2013, award, and that as such, those dates did not constitute an "unauthorized absence."  *Id*. at 3.  The umpire dismissed the NOD, and Plaintiff never served the suspension.  (Dkt. Nos. 37-21 at 50-51; 37-22 at ¶ 56.)

### D.     EEOC Charge Filed on August 29, 2013

On August 29, 2013, while his grievance was pending on the August 2, 2013, NOD, Plaintiff filed a second charge with the EEOC.  (Dkt. No. 37-47.)  Plaintiff claimed that he had been suspended effective August 16, 2013, in retaliation for filing a discrimination charge with the EEOC in February 2013 and a lawsuit charging racial discrimination in July 2013.  *Id*.  The EEOC issued a right to sue letter on March 13, 2014.  (Dkt. No. 37-48.)

### E.     December 14, 2013, Incident

The Decontamination Room Operations policy at Upstate requires that all soiled equipment enter the decontamination room "through the soiled equipment entry door only."

(Dkt. No. 37-54 at 1.)  On December 14, 2013, Plaintiff was involved in an incident with another employee, M.F., as Plaintiff was bringing a patient privacy screen to the office to be put away without walking through the decontamination room.  (Dkt. Nos. 37-21 at 55; 37-56.)  M.F., who believed the screen was dirty, stepped in front of Plaintiff and kept him from entering the department even though Plaintiff tried to explain to him that the screen was clean.  *Id*. at 55-56.  Plaintiff told M.F. to "get the fuck out of my way," to which M.F. responded "I'm not fucking moving, and I'm going to stand right here."  *Id*. at 56.  M.F. snatched the screen out of Plaintiff's hands and threw it in the decontamination room.  *Id*. at 57.  M.F., a Caucasian, was issued an NOD, dated February 7, 2014, proposing termination for swearing at Plaintiff, breaking Upstate equipment, placing dirty equipment in the clean side of the decontamination room, and insulting Plaintiff.  (Dkt. No. 37-56.)  All charges were dropped against M.F. when Plaintiff failed to appear to give testimony at M.F.'s grievance hearing, despite having been served with a subpoena.  (Dkt. No. 37-83 at ¶ 95.)  According to Plaintiff, he did not testify because the subpoena had not been legally served.  (Dkt. No. 43-2 at ¶ 95.)

Following the December 14, 2013, incident with M.F., Plaintiff sent a letter to Upstate that was received by the Defendant on December 18, 2013.  (Dkt. Nos. 37-22 at ¶ 90; 37-53.)  In the letter, Plaintiff addressed a December 10, 2013, incident with M.F. and Maguire, and the December 14, 2013, incident with M.F., writing:

> I'm making a complaint against Mr Maguire and Mr. F [blacked out] for rape.  It seems to me that they have might want to have some type of sexual feelings for me.  I don't understand why they would make it so difficult for me.  They are constantly trying to force themselves on my mental status.  It's ether (sic) the two or one of them, that are always tying to brake me down.  I can't focus anymore on what I'm doing.  I have to look over my shoulder every

day. I shouldn't have to do that. I am seeking help, so that I can
deal with situation.

(Dkt. No. 37-53.)

The allegation of rape was determined to be unfounded when Plaintiff reported that he

had never been sexually or physically assaulted. (Dkt. Nos. 37-22 at ¶ 92; 37-82.) Plaintiff

testified at his deposition that he was not claiming that anyone had tried to sexually or physically

assault him, explaining that in using the word "rape" he had meant using "mental force of rape,

trying to force [him] to do something that [he is] not required to do, and that's what I meant by

rape, and I explained that also." (Dkt. No. 37-21 at 95.)

### F. January 21, 2014, Meeting with Reed.

According to Plaintiff, on January 21, 2014, Plaintiff's manager, Brian Reed ("Reed"),

called Plaintiff into his office and told him that he could write him up and fire him. (Dkt. No.

37-21 at 35, 51.) Plaintiff responded that Reed could not fire him. *Id*. at 54. Plaintiff was not

disciplined in any fashion as a result of the meeting. *Id*. at 55.

### G. Grievance Received by Upstate on February 7, 2014

On February 7, 2014, Upstate received a grievance from Plaintiff dated January 29, 2014.

(Dkt. No. 37-49.) The grievance complained of two separate incidents. The first incident, with

respect to which Plaintiff alleged violation of Article 25.2 of the CSEA contract dealing with

discrimination, was the January 21, 2014, incident with Reed. *Id*. According to Plaintiff, he and

Reed had a horrible relationship and Reed was a bully. (Dkt. No. 37-21 at 52.) Plaintiff believed

that Reed was discriminating against him based on race. *Id*.; Dkt. No. 37-49.

A Step 1 meeting to discuss the grievance attended by Plaintiff and his union

representative, Reed, Sadeckas, and Johnson was held on June 5, 2014. (Dkt. No. 37-50.) According to Johnson's June 12, 2014, response denying the grievance, when asked which protected category listed in Article 25.2 the alleged discrimination was based on, Plaintiff said none of them. *Id.* at 1. Based upon Plaintiff's response, Johnson found that there had been no violation of Article 25.2. *Id.* Johnson also noted in her grievance response that at the meeting on January 21, 2014, Reed had told Plaintiff he was not meeting the expectations of his job; he could be written up for not performing his duties; and if problems continued, Reed could seek termination of Plaintiff's employment, to which Plaintiff responded there was no way Reed could fire him. *Id.* at 2.

The second incident in the grievance occurred on January 25, 2014, when Plaintiff claimed he was forced to work overtime. (Dkt. No. 37-49.) Plaintiff asserted that although he was next on the mandatory overtime list, because there was no state call-in, and the need for someone to work overtime resulted from there being a hole in the schedule that management should have fixed, mandatory overtime did not apply. (Dkt. Nos. 37-50 at 2; 43-2 at ¶ 79.) Johnson found that Plaintiff was properly assigned mandatory overtime under Article 27.1 of the CSEA contract. (Dkt. No. 37-50 at 2.) There is nothing in the record indicating that Plaintiff appealed the Step 1 denial of the grievance to Step 2 as authorized pursuant to Article 34.4(b) of the CSEA contract. *Id.* at 2.

### H. February 12 and 14, 2014, Incidents Between Plaintiff and Reed

On the afternoon of February 12, 2014, Reed and David Eck ("Eck") were explaining how the process for using Igotit on the Ipod touch was to be done to Plaintiff. (Dkt. Nos. 37-58; 37-59.) Plaintiff had not been using his Ipod touch device or not using it properly. (Dkt. No. 37-

59.)  According to Eck, Reed's tone was calm, and he was talking to Plaintiff in a non-accusatory way.  *Id*.  Plaintiff reacted immediately and harshly to Reed's comments, stating that he did not know what he was supposed to do because the new system was hard to use.  *Id*.  Plaintiff argued that his way was easier and the new way was not right.  (Dkt. No. 37-58.)  Reed informed Plaintiff that they needed him to acknowledge on his Ipod when he got a delivery; when he actually had the equipment in hand to start the delivery; and when he was physically at the location of the drop off to finish the delivery.  *Id*.  Plaintiff told Reed that "it is bullshit" and "we are too short staffed."[8]  *Id*.  Reed acknowledged that they were short staffed.  *Id*.  When Reed asked Plaintiff if he understood his expectations, Plaintiff walked away.  *Id*.  Reed asked the question three more times, and Plaintiff continued to walk away.  *Id*.  Plaintiff claims that he walked away from a hostile work environment because Reed was behaving unprofessionally.  (Dkt. No. 43-2 at ¶ 97.)  Twenty minutes later Plaintiff returned to the department and Reed explained the procedure again.  (Dkt. No. 37-58.)  Plaintiff indicated he would follow it.  *Id.*

On February 14, 2014, Reed asked Plaintiff to read and sign off on the new work instructions for the St. Croix system they were implementing.  (Dkt. No. 37-61.)   Reed had been asking Plaintiff to sign off for three consecutive days and he had yet to do it.  *Id*.  Plaintiff told Reed he would read the instructions but would not sign anything without a union representative.  *Id*.  Reed contacted Johnson to see if she could get a union representative, and Johnson told Reed that Plaintiff did not need a union representative to sign it.  *Id.*  Plaintiff continued to refuse to sign even when Reed gave him a direct work order to do so and informed Plaintiff that failure to

---

[8]  At his deposition, Plaintiff acknowledged saying in sum or substance "we don't have enough technicians and you fucking know it."  (Dkt. No. 37-21 at 62.)  Plaintiff also acknowledged he probably said in sum or substance as he walked out, "this is bullshit."  *Id.*

follow the order would be considered insubordination and result in disciplinary action. *Id.* Reed placed Plaintiff on paid administrative leave and escorted him about of the building. *Id.*; Dkt. No. 37-22 at ¶¶ 123-24. As Plaintiff was walking out he yelled "I'm not signing shit; Robbie, I'm giving you a direct work order" in a manner described as mocking Reed. *Id.*

## I. New York Civil Service Law § 72 Examination

On April 4, 2014, while Plaintiff was on administrative leave, Upstate requested a Civil Service § 72 examination of Plaintiff because of behavioral issues, including the rape accusation. (Dkt. Nos. 37-22 at ¶¶ 125-26; 37-63.) In the request, Upstate provided, *inter alia*, a summary of the incident involving the note placed in the locker of Plaintiff's co-worker, the rape allegation, and the incidents on December 14, 2013, January 21, 2014, February 12, 2014, and February 14, 2014. (Dkt. No. 37-63 at 2-3.) Plaintiff was examined by a psychiatrist on April 16, 2014, and found able to perform his work duties. (Dkt. No. 37-65.)

## J. May 21, 2014, Letter Directing Return to Work and Enclosing a Third NOD

On May 21, 2014, Johnson sent a letter to Plaintiff directing him to report back to work and providing his schedule for the week beginning May 22, 2014. (Dkt. No. 37-66.) The letter informed Plaintiff that attempts had been made to reach him by telephone to inform him he was required to report to work on May 21, 2014, and that his failure to return in accordance with the schedule would be considered insubordination and might lead to further disciplinary action, up to and including termination of employment. *Id.* A May 21, 2014, NOD was enclosed. *Id.*; Dkt. No. 37-67.

The NOD informed Plaintiff that Upstate proposed to terminate him for the following incompetence/misconduct: (1) on December 14, 2013, inappropriately bringing a dirty privacy

16

screen into the clean side of the Equipment Department instead of taking it into the decontamination room; (2) on December 14, 2013, engaging in a verbal altercation with co-worker M.F. and stating, in sum and substance, shut the fuck up; you're not my boss and walking away; (3) on February 12, 2014, yelling, in sum and substance, we don't have enough technicians and you fucking know it when Reed and Eck were attempting to remind Plaintiff how requests for equipment should be handled as a part of the new St. Croix system; (4) on February 12, 2014, yelling, in sum and substance, this is bullshit and inappropriately walking out of the department despite Reed trying to talk to him, when Reed and Eck were attempting to remind Plaintiff how requests for equipment should be handled as a part of the new St. Croix system; and (5) on February 14, 2014, as he was leaving the department, in the presence of a co-worker inappropriately stating in sum and substance, I'm not signing shit, and Robbie, I'm giving you a direct order, in a manner described as mocking his manager. (Dkt. No. 37-51.)

Plaintiff filed a disciplinary grievance related to the May 21, 2014, NOD on May 29, 2014. (Dkt. No. 37-52.) Plaintiff, who believed that the basis for the NOD was his refusal to sign the document as directed by Reed, wrote with regard to charges one through four that he had not been sent away from work for those things. *Id.* With regard to the fifth item, Plaintiff asserted that "no employee shall be made to sign anything if requesting their CSEA representative." *Id.* The grievance was never heard by the arbitrator as a result of subsequent occurrences. (Dkt. No. 37-22 at ¶ 87.)

### K. Formal Counseling Memorandum, Dated June 13, 2014

On June 13, 2014, Reed issued Plaintiff a Formal Counseling Memo (Time & Attendance) regarding Plaintiff's time and attendance use from October 1, 2013, through May

23, 2014. (Dkt. No. 37-67.) The memo noted that Plaintiff and Reed had met informally to discuss Plaintiff's time and attendance on June 9, 2014. *Id*. Prior to that, Plaintiff, Maguire, and Reed had met on September 17, 2013, to discuss Plaintiff's attendance. *Id*. According to the memo, since the September 17, 2013, discussion, Plaintiff had been absent from work:

| | |
|---|---|
| 10/01/2013 | 1.5 hours sick regular (left work early) |
| 10/06/2012 | 2.5 hours unauthorized (left work early w/o authorization) |
| 10/11/2013 | 5.5 hours sick regular (left work early) |
| 11/21/2013 | 8 hours sick regular |
| 12/16/2013 | 8 hours sick regular |
| 01/24/2014 | 3.25 hours unauthorized (left work early w/o authorization) |
| 01/30/2014 | 8 hours unauthorized absence (no call/no show) |
| 05/22/2014 | 8 hours unauthorized absence (failed to return from leave) |
| 05/23/2014 | 8 hours unauthorized absence (failed to return from leave) |
| 06/02/2014 | 8 hours sick regular |

*Id*. According to Plaintiff, the absences on May 22 and 23, 2014, resulted from his need to find child care after learning in the May 21, 2014, letter that his suspension had ended, and he was to return to work. (Dkt. No. 37-21 at 70-71.)

The June 13, 2014, memo noted that Plaintiff had also received formal counseling memoranda regarding time and attendance on September 13, and 21, 2011. (Dkt. Nos. 37-28; 37-29.) The first dealt with Plaintiff's failure to perform mandatory overtime, and the second was for unscheduled and unapproved absences. *Id.*

When Plaintiff continued to have unscheduled absences after being issued the June 13, 2014, memo, Reed issued him an ELC Requirement Memorandum, dated July 21, 2014, requiring him to provide a completed Employee Leave Certification Form each time he was absent from work "due to an alleged personal illness/injury and/or to care for an ill/injured family member." (Dkt. No. 37-68.) The requirement was to remain in effect for three months. *Id*.

**L.     September 22, 2014, Incident, Plaintiff's Mental Health Issues, and Worker's Compensation Claim**

      1.    Incident in Reed's Office

According to Plaintiff's deposition testimony, shortly after he arrived at work on September 22, 2014, Reed called him into his office. (Dkt. No. 37-21 at 80-81.) Reed closed the door. *Id*. at 81. Reed asked Plaintiff why he disrespected him, and Plaintiff responded he did not see where he had disrespected him. *Id*. Reed told Plaintiff he was talking about the way Plaintiff came in every day and walked right by Reed without saying anything. *Id*. at 82. Plaintiff testified that Reed said "all the times you come into work, you don't say nothing to me nor do you say anything to your coworkers." *Id*. at 83. Plaintiff responded "What does me saying anything to coworkers have to do with me working or say anything to you." *Id*. Reed responded something to the effect that it was disrespectful. *Id*. Plaintiff said "listen, there's a problem here. I have a solution for it, and the solution is why don't we just don't say anything to each other. You don't try to speak to me, and I won't try to speak to you." *Id*. at 83-84.

When Reed responded that if he did that, Plaintiff would claim that he was treating him differently, Plaintiff said "I'm telling you right now, it's okay. We don't have to talk. I'd rather for it to be that way." *Id*. at 84. Plaintiff testified that when Reed asked Plaintiff why he felt that way, he responded "you're trying to fire me. You've been trying to fire me since you've been here. What makes you think I want to speak to you. You've treated me like crap since I've been working here, so I don't want to say hi to you, and I'd rather for it to be that way." *Id.* Reed became frustrated and began shouting at Plaintiff. *Id*. at 84. Reed got up, came close to Plaintiff, and kicked the trash can. *Id*. at 85. Reed swung the door open and screamed for Plaintiff to get

out of his office.  *Id.*  Plaintiff got up and walked out.  *Id.*

Plaintiff believes that what happened at the meeting with Reed was racial bullying, and that Reed intended to put him down and treat him unfairly.  *Id.* at 94.  Plaintiff has never seen Reed treat anyone else in a similar fashion.  *Id.*

According to Reed's September 24, 2014, statement regarding the meeting in his office, when he asked Plaintiff if everything was okay and what was going on, Plaintiff asked why. (Dkt. No. 37-81.)  Reed responded that he said hello to Plaintiff and asked him how he was doing every day, and Plaintiff never responded.  *Id.*  Plaintiff told Reed he did not want to talk to him because he was a bully.  *Id.*  Reed said he was not a bully but did hold Plaintiff to the same standards and accountability as everyone else.  *Id.*  Reed also explained to Plaintiff that when he left early he had to inform either Reed or Maguire, and if he did not follow that policy he would be disciplined.  *Id.*  Plaintiff said he would not do that, and that his union had told him Maguire was not his supervisor.  *Id.*  According to Reed, the conversation continued for twenty-five to thirty minutes with Plaintiff being very argumentative in everything Reed said.  *Id.*  Reed finally told Plaintiff to get out of his office, and Plaintiff told a co-worker he was leaving a couple of hours later.  *Id.*

### 2.    Plaintiff's Mental Health Issues and Worker's Compensation Application

Plaintiff went to his locker after leaving Reed's office.  (Dkt. No. 37-21 at 86.)  He felt like the room was closing in on him, he couldn't hear anything, and he did not know what to do. *Id.*  Plaintiff attempted to focus by looking up his calls.  *Id.* at 86.  When he realized he was not able to function at his job, Plaintiff signed himself out of work after informing the team leader he was leaving.  *Id.* at 87.  Plaintiff went directly to Psychological Health Care and spoke with a

therapist he had been seeing for anxiety and depression prior to September 22, 2014. *Id*. at 25, 87-88.

According to Plaintiff, he went back to see the therapist two days later, and he could not control his emotions anymore. *Id*. at 88. He dreaded going back to work and just could not do it. *Id*. He told the therapist about the nightmares he was having, the fears, and his inability to sleep for two days. *Id*. Plaintiff submitted an injury report to Upstate on September 24, 2014. *Id*. at 89. Plaintiff testified at his deposition held in March 2016 that he has been diagnosed with Post Traumatic Stress Disorder ("PTSD") and that he has been treating almost weekly with Dr. Kelly Richards, a psychologist, since September 2014. *Id*. at 13.

Plaintiff applied for Worker's Compensation benefits for work related stress because of the incident with Reed, but his application was denied on the basis that the stress experienced by Plaintiff at work was no greater than similarly situated employees in a normal work environment. *Id*. at 11, 80; Dkt. No. 37-72. Plaintiff was going through an appeal at the time of his deposition. *Id*.

**M. New York State Human Rights Division ("DHR") Complaint, filed on February 25, 2015**

Plaintiff filed a complaint against Upstate with the DHR on or about February 25, 2015, in which he alleged that he had been the victim of discrimination and or retaliation by Reed and Johnson. (Dkt. No. 37-74 at 1-7.) Plaintiff claims he was retaliated against for participating in an employment discrimination proceeding. *Id*. at 4. Plaintiff identified the acts of discrimination as being suspended, being denied leave time and other benefits, and being given a disciplinary notice or negative performance evaluation. *Id* at 5. Plaintiff set forth the date of the most recent

act of discrimination as May 21, 2014.  *Id*. at 2.

More specifically, Plaintiff complained of having been removed from work on February 2, 2014 to May 26, 2014, for declining to sign a work order without a CSEA representative; the June 13, 2014, formal counseling memorandum on time and attendance; and failure to give Plaintiff a performance evaluation after 2010.  *Id*. at 6.  According to Upstate, refusal to sign the work order was not the basis of the May 21, 2014, NOD.  (Dkt. No. 37-83 at ¶ 147.)  Rather, Plaintiff was actually disciplined for bringing the dirty privacy screen into the clean side and exhibiting abusive language and behavior towards staff.  *Id*. at ¶ 148.

In a July 28, 2015, Determination and Order After Investigation, the DRH noted that the investigation did not establish a nexus between Plaintiff's opposition to discrimination and any subsequent employment actions, and found no probable cause to believe that Upstate had engaged in or was engaging in the unlawful discriminatory practice complained of by Plaintiff. (Dkt. No. 37-75.)

### N.      Termination of Plaintiff's Employment

Plaintiff did not return to work after September 22, 2014.  (Dkt. No. 37-76.)  On August 26, 2015, Upstate sent Plaintiff a letter informing him that it intended to terminate his employment on September 23, 2015, because he was continuously absent and unable to perform his work duties in accordance with Civil Service Law § 73.  *Id*.  The letter described Plaintiff's right to apply for restoration to duty if he was medically fit to perform the duties of his position. *Id*.  The letter also advised Plaintiff of his right, in the event he did not apply for restoration to duty, to submit reasons why he believed he should not be terminated.  *Id*.

Plaintiff's employment was terminated at the close of business on September 23, 2015,

22

and he was notified of the termination by letter of September 24, 2015. (Dkt. No. 37-77.) The letter advised Plaintiff that should he recover from his disability, he had the right under Civil Service Law § 73 to apply to the New York State Department of Civil service within a year from the end of his disability for a medical examination to determine his fitness to return to work. *Id.* If found fit, he would be considered for reinstatement. *Id.*

### O.     EEOC Charge, filed on December 11, 2015

Following commencement of this lawsuit, Plaintiff filed a new charge of discrimination by Upstate with the EEOC. (Dkt. No. 37-78.) By letter of February 17, 2016, the EEOC informed Plaintiff of its determination that it would not be able to investigate and conciliate the charge within 180 days, and would not file a lawsuit during that time, and notified Plaintiff of the right to sue. (Dkt. No. 37-79.)

### III.     PLAINTIFF'S TITLE VII CLAIMS

### A.     Retaliation Claims

In his first amended complaint, Plaintiff has described this Title VII lawsuit as one for "retaliat[ion] against Plaintiff for having filed previous complaints alleging that Defendant engaged in discriminatory treatment of Plaintiff on the basis of his race." (Dkt. No. 23 at ¶ 1.) Moreover, the sole count in the first amended complaint, erroneously labeled "Age Discrimination," is for retaliation in violation of Title VII. (Dkt. No. 23 at ¶¶ 45-47.) Plaintiff has also identified his claim against Defendant solely as one for retaliation in the preliminary statement in his memorandum of law in opposition to Defendant's motion and has argued only retaliation in the memorandum. (Dkt. No. 43 at 10-11.)

In Plaintiff's first amended complaint, he has specifically identified the following acts of

alleged retaliation: (1) placing Plaintiff in Equipment rather than Distribution when he returned

to work on July 4, 2013, following his suspension from July 5, 2012, to July 3, 2013; (2) issuing

an August 2, 2013, NOD claiming falsely that Plaintiff had five consecutive days of unauthorized

absences and proposing a suspension without pay commencing August 16, 2013; and (3)

unfounded NODs in which Sadeckas and Johnson sought the maximum penalty against Plaintiff.

(Dkt. Nos. 23 at ¶¶ 20-32.)

Plaintiff has also alleged in conclusory fashion in his first amended complaint that he

"has experienced consistent retaliation, including additional unfounded Notices of Discipline

against him since returning to work. Defendant has continued to engage in a retaliatory course of

conduct designed to annoy, harass and punish Plaintiff for having filed previous race

discrimination complaints against Upstate." (Dkt. No. 23 at ¶ 31.) In his separate statement of

facts in response to Defendant's motion, Plaintiff has repeated the conclusory allegation of

retaliatory conduct and has cited to segments of his deposition transcript to identify the allegedly

retaliatory actions. (Dkt. No. 43 at ¶ 17.) The deposition transcript segments identified by

Plaintiff make reference to: (1) requiring Plaintiff to undergo a medical examination pursuant to

Civil Service Law § 72 in April 2014 (Dkt. No. 37-21 at 106-07); (2) issuance of a May 21,

2014, NOD, *id*. at 77; (3) the June 13, 2014, formal counseling memorandum allegedly issued to

Plaintiff by Reed regarding unexcused absences, *id*. at 73-75; Dkt. No. 43-5 at 2; (4) the

September 22, 2014, verbal disagreement in Reed's office (Dkt. No. 37-21 at 93); and (5)

termination of Plaintiff's employment so that Upstate would not have to deal with grievances he

had filed. *Id*. at 96. It appears from Plaintiff's separate statement of material facts that he may

also be asserting retaliation claims with respect to a January 21, 2014, meeting with Reed in

which Reed threatened to fire Plaintiff (Dkt. No. 43 at ¶ 20), and a February 14, 2014, administrative suspension with pay by Reed.  *Id*. at ¶ 21.

### B.      Conclusory Assertions of Racial Discrimination

Although Plaintiff has consistently described his lawsuit as one for retaliation under Title VII, he has also made conclusory allegations of disparate treatment based upon race in his first amended complaint, his separate statement of facts, and his deposition testimony.  (Dkt. Nos. 23, 37-21, 43.)  In his first amended complaint, Plaintiff has alleged that "Defendant treated Plaintiff in a materially and objectively worse manner than it treated the other employees for no apparent reason other than that Plaintiff was not white and because he had filed previous race discrimination complaints against Upstate."  (Dkt. No. 23 at ¶ 33.)  Plaintiff also alleged that he "stands prepared to introduce additional examples of disparate treatment and retaliation at the hands of Defendant."  *Id*. at ¶ 41.

In his separate statement of material facts (Dkt. No. 43 at ¶ 19), Plaintiff repeated the allegation in his first amended complaint regarding being treated "in a materially and objectively worse manner" because he was not white and had filed race discrimination complaints, specifically citing to his deposition testimony: (1) regarding the August 2, 2013, NOD (Dkt. No. 37-21 at 47-49); (2) the June 13, 2014, counseling memo, *id*. at 74-75; (3) the May 21,  2014, NOD, *id*. at 77-79; (4) the September 22, 2014, verbal dispute with Reed, *id*. at 93; (5) the Civil Service § 72 medical examination, *id*. at 106-07; and (6) termination of his employment.  (Dkt. Nos. 37-21 at 96; 43 at ¶ 19.)   It appears from Plaintiff's separate statement of material facts that he may also be asserting race discrimination claims with respect to the January 21, 2014, meeting with Reed and February 14, 2014, suspension with pay.  (Dkt. No. 43 at ¶¶ 20-21.)

IV.    **APPLICABLE SUMMARY JUDGMENT LEGAL STANDARDS**

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 272-73. The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998). A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and internal quotation marks omitted).

In *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005), the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in

support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." "To defeat summary judgment, . . . nonmoving parties "may not rely on conclusory allegations or unsubstantiated speculation." *Jeffreys*, 426 F.3d at 554 (citation and internal quotation marks omitted). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id*. (citation and internal quotation marks omitted). "[T]o satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory allegations. "*Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (citation omitted). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party, in this case Upstate. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).

## V.     BURDEN SHIFTING FRAMEWORK FOR ANALYSIS OF TITLE VII CLAIMS

### A.     Employment Discrimination

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting 42 U.S.C. § 2000e-2(a)(1)). "[T]he phrase 'terms, conditions, or privileges of employment' evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986) (citation and internal quotation marks omitted).

Title VII claims for discrimination are evaluated using the burden-shifting framework set forth in *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973). *See Kirkland v. Cablevision Systems*, 760 F.3d 223, 225 (2d Cir. 2014). "Under this framework, a plaintiff must first establish a *prima facie* case of discrimination." *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491-92 (2d Cir. 2010). To establish a *prima facie* case of employment discrimination, a plaintiff must show that "(1) he belongs to a protected group; (2) he was qualified for his position; (3) his employer took an adverse action against him; and (4) the adverse action occurred in circumstances giving rise to an inference of discrimination." *See Kirkland*, 760 F.3d at 225. "An inference of discrimination can be drawn from circumstances such as 'the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's [adverse employment action.]'" *Barella v. Vill. of Freeport*, 16 F.Supp. 3d 144, 162 (E.D.N.Y. 2014) (quoting *Abdu-Brisson v. Delta Air Lines, Inc*., 239 F.3d 456, 468 (2d Cir. 2001) (internal punctuation omitted). "The burden of proof that must be met to permit a Title VII plaintiff to survive a summary judgment motion at the *prima facie* stage has been characterized as 'minimal' and '*de minimis*.'" *Jute v. Hamilton Sundstrand Corp*., 420 F.3d 166, 173 (2d Cir. 2005) (quoting *Woodman v. WWOR-TV*, 411 F.3d 69, 76 (2d Cir. 2005) (internal quotation marks omitted).

Once the plaintiff makes a *prima facie* case of discrimination, the burden shifts to the employer to provide a legitimate, non-discriminatory reason for its actions. *See Kirkland*, 760 F.3d at 225. "With respect to a discrimination claim, 'once the [employer] has made a showing of a neutral reason for the complained of action, to defeat summary judgment . . . the

[employee's] admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the [employer's] employment decision was more likely than not based in whole or in part on discrimination.'" *Id.* (quoting *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)).

## B. Retaliation

The anti-retaliation provision of Title VII "prohibits an employer from 'discriminat[ing] against' an employee or job applicant because the individual 'opposed any practice' made unlawful by Title VII or 'made, charged, testified, assisted, or participated in' a Title VII proceeding or investigation." 42 U.S.C. §2000e-3(a). *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56 (2006); *see also Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 567 (2d Cir. 2011) (The anti-retaliation provision "seeks to further Title VII's goal of a workplace free from discrimination on the basis of race, ethnicity, religion, or gender by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of Title VII's basic guarantees.") (citation and internal quotation marks and punctuation omitted).

Title VII claims for retaliation are also evaluated using the burden-shifting framework set forth in *McDonnell Douglas*, 411 U.S. at 802. *See Kirkland,* 760 F.3d at 225. To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show that: (1) he was engaged in a protected activity; (2) the employer was aware of that activity; (3) plaintiff suffered a materially adverse action[9]; and (4) there was a causal connection between his protected activity and the

---

[9] The anti-retaliation provision of Title VII "does not confine the actions and harm it forbids to those that are related to employment or occur at the workplace." *Burlington N.*, 548 U.S. at 57.

adverse action.  *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012).  As with employment

discrimination claims, the burden of proof plaintiff must meet to survive summary judgment at

the *prima facie* stage is 'minimal' and '*de minimis*.'"  *Jute,* 420 F.3d at 173.

A *prima facie* showing by Plaintiff "creates 'a presumption of retaliation,' which the

defendant may rebut by 'articulat[ing] a legitimate, non-retaliatory reason for the adverse

employment action.'"  *Ya-Chen Chen v. City University of New York*, 805 F.3d 59, 70 (2d Cir.

2015) (quoting *Jute*, 420 F.3d at 173).  If defendant provides a non-retaliatory reason, "the

presumption of retaliation dissipates" and plaintiff is required to prove "that the desire to retaliate

was the but-for cause of the challenged employment action."  *Univ. of Texas Sw. Med. Ctr. v.

Nassar*, ___ U.S. ___, 133 S.Ct. 2517, 2528 (2013)[10]; *see also Zann Kwan v. The Andalex Grp.

LLC*, 737 F.3d 834, 846 (2d Cir. 2013) ("'but-for' causation does not require proof that

retaliation was the only cause of the employer's action, but only that the adverse action would not

have occurred in the absence of the retaliatory motive.")

Title VII does not protect employees from "all retaliation," but only retaliation that

produces an injury or harm.  *Burlington N.*, 548 U.S. at 67; *see also Tepperwien,* 663 F.3d 569.

"Actions that are 'trivial harms'     *i.e.*, 'those petty slights or minor annoyances that often take

---

[10]  In *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S.Ct. at 2528, the Supreme Court
explained that an employee alleging a status-based discrimination claim under Title VII is not
required to show "that the causal link between injury and wrong is so close that the injury would
not have occurred but for the act.  So-called but-for causation is not the test.  It suffices instead to
show that the motive to discriminate was one of the employer's motives, even if the employer
also had other, lawful motives that were causative in the employer's decision." 133 S.Ct. at 2522-
23.  On the other hand, a Title VII retaliation claim must be proved "according to traditional
principles of but-for-causation, not the lessened causation test stated in [42 U.S.C.] § 2000e-
2(m).  This requires proof that the unlawful retaliation would not have occurred in the absence of
the alleged wrongful action or actions of the employer."  *Id*.  at 2533.

place at work and that all employees experience' are not materially adverse." *Id*. at 568.

"Context matters, as some actions may take on more or less significance depending on the

context." *Id*. Alleged acts of retaliation "must be evaluated both separately and in the aggregate,

as even trivial acts may take on greater significance when they are viewed as part of a larger

course of conduct." *Id*.

## VI.    ANALYSIS OF PLAINTIFF'S CLAIMS

### A.    Reassignment to Equipment Upon Return to Work

Plaintiff claims that he was reassigned from Distribution to Equipment when he returned

to work in July 2013 in retaliation for filing a charge of discrimination with the EEOC on

February 11, 2013.  (Dkt. Nos. 23 at ¶¶ 21-25; 37-37.)  Plaintiff has also included the

reassignment in his wholly conclusory assertion of racial discrimination.  (Dkt. No. 43 at ¶ 19.)

The Court will address both the discrimination and retaliation claims.

Defendant has conceded that Plaintiff is a member of a protected class and for purposes

of this motion that he was qualified for his position of supply assistant, the first two elements of a

*prima facie* case of employment discrimination.  (Dkt. No. 37-1 at 10.)  Defendant has also

acknowledged that Plaintiff filed various discrimination charges with the EEOC and commenced

a prior Title VII lawsuit and does not deny that the filing was a protected activity, the first two

elements of a *prima facie* case of retaliation.[11]  (Dkt. No. 37-83 at ¶ 44.)

The Court finds, however, that despite the minimal burden of proof imposed on him,

Plaintiff has failed to submit sufficient evidence that the reassignment constituted a materially

---

[11]  Defendant's concessions with regard to the first two elements of Plaintiff's *prima facie*
showing requirements will be deemed to apply to each of Plaintiff's employment discrimination
and retaliation claims.

adverse employment action for purposes of making a *prima facie* showing of race discrimination, or of adverse employment action for purposes of his retaliation claim.[12]

"An adverse employment action for purposes of an employment discrimination claim is 'a materially adverse change in terms and conditions of employment.'" *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008) (quoting *Sanders v. New York City Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) (internal modification omitted). "To be materially adverse, a change in working conditions must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Sanders*, 361 F.3d at 755 (citation and internal quotation marks omitted). Examples include "a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Mathirampuzha,* 548 F.3d at 78 (quoting *Sanders*, 361 F.3d at 755).

To establish a materially adverse action for purposes of Title VII retaliation, "a plaintiff must show that [his or] her employer engaged in action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Lin v. New York State Dept. of Labor*, No. 1:14-cv-0771 (LEK/DJS), 2017 WL 435811, at * 5 (N.D.N.Y. Feb. 1, 2017) (quoting *Burlington N.* 548 U.S. at 57). On a retaliation claim, adverse action is not confined to actions and harms that are related to employment or occur in the workplace. *Burlington N.*, 548 U.S. at 57. Material adversity is to be determined objectively based on the actions of a reasonable employee in both discrimination and retaliation claims. *Id*. at 69-70; *Thomson v. North*

---

[12]   The Court's determination of Plaintiff's race discrimination and retaliation claims is the same regardless of whether Plaintiff was hired to work in Distribution as he claims or Equipment as claimed by Johnson. (*See* Dkt. Nos. 37-83 at ¶ 2; 43-2 at ¶ 2.)

*American Stainless*, LP, 562 U.S. 170, 174 (2011).  Context matters inasmuch as some actions may take on more or less significance depending on context.  *Tepperwien*, 663 F.3d at 568.

When Plaintiff was reassigned from Distribution to Equipment upon his return to work, he continued to work the same shift on the same days.  (Dkt. No. 37-21 at 34.)  Although Plaintiff claims the reassignment was a demotion because he had been doing grade seven work in distribution, there is no non-conclusory evidence in the record regarding that claim, and Plaintiff has conceded that his position in Distribution was grade four supply assistant, and that he continued to work in the grade four position of supply assistant and to receive the same pay when was reassigned from Distribution to Equipment.  *Id.* at 32-33.

"A lateral job transfer that does not affect an employee's salary or title may be the basis for a Title VII retaliation claim only if the reassignment would have been viewed by a reasonable employee as being materially adverse."  *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 555 (2d Cir. 2010).  Plaintiff has not submitted evidence showing that a reasonable person would find a change from a grade four supply assistant in Distribution to the same position in Equipment, with pay and work schedule remaining the same, to be materially adverse.  At best, Plaintiff has shown that he had an "alteration of job responsibilities," which is not sufficient to show a materially adverse change in work conditions.[13]  *Sanders*, 361 F.3d at 755.

Furthermore, the Court concludes that a reasonable jury would not find that an alteration in Plaintiff's job responsibilities with the same title, same work hours, and same pay grade would

---

[13]  Plaintiff claims that under the CSEA contract, he was entitled to thirty days notice of the reassignment.  (Dkt. No. 23 at ¶ 25.)  However, under CSEA contract § 32.2(b), Plaintiff would have been entitled to thirty days notice only if changes were being made to his work day, work week, or shift.  (Dkt. No. 37-23 at 49.)

be enough to dissuade a reasonable worker from making or supporting a charge of discrimination. *See Lin,* 2017 WL 435811, at * 5. It did not dissuade Plaintiff from filing a retaliation claim with the EEOC less than two months later on August 29, 2013. (Dkt. No. 37-47.)

Even if Plaintiff could be found to have made a *prima facie* showing of materially adverse employment action, he has presented nothing more than a conclusory assertion of racial discrimination, which is inadequate to give rise to the inference of race discrimination necessary to support a *prima facie* case of discrimination. *See Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) ("Even in the discrimination context . . . a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment."). Furthermore, even if Plaintiff could be found to have established a *prima facie* case of discrimination or retaliation, Defendant has submitted evidence that the reassignment was made due to non-discriminatory operational needs.

According to a June 26, 2013, memo from Sadeckas to Johnson, because of a change in a delivery schedule less staff was needed in Distribution on Plaintiff's shift, and because many of the discharges occurred later in the day when Equipment had a reduced staff, Plaintiff could provide assistance in Equipment on his regular shift. (Dkt. Nos. 37-22 at ¶ 42; 37-80.) Plaintiff has failed to submit evidence sufficient to permit a rational fact finder to infer that Defendant's decision "was more likely than not based in whole or in part on discrimination." *Kirkland*, 760 F.3d at 224. Given Defendant's explanation that the reassignment was based on operational needs, which has not been challenged by record evidence, the Court finds that Plaintiff has also failed to show that the reassignment would not have occurred in the absence of the retaliatory

motive.  *See Zann Kwan*, 737 F.3d at 846.  Therefore, the Court finds that Defendant is entitled to summary judgment on Plaintiff's discrimination and retaliation claims related to his reassignment from Distribution to Equipment.

**B.     August 2, 2013, NOD**

Plaintiff claims that the August 2, 2013, NOD proposing a fine equivalent to a three week suspension without pay commencing August 16, 2013, for five consecutive unauthorized absences from work was issued in retaliation for the race discrimination lawsuit he filed on July 15, 2013.  (Dkt. No. 37-21 at 48-49.)  Plaintiff also claims race discrimination.  *Id.*  The unauthorized absences occurred on June 28, 2013, to July 3, 2013, which were the days between Sadeckas' June 27, 2013, attempt to reach Plaintiff by telephone to instruct him to return to work following the arbitration award, and July 3, 2013, the day before Plaintiff did return to work.  (Dkt. Nos. 37-40; 37-43.)  Because Plaintiff prevailed on his grievance, the suspension never occurred.  (Dkt. No. 37-45.)

"[T]he weight of authority from within this Circuit makes clear . . . that a plaintiff's unpaid suspension . . . constitute[s] [an] adverse employment action."  *Bader v. Special Metals Corp.*, 985 F.Supp. 2d 291, 307 (N.D.N.Y. 2013) (quoting *Delia v. Donahoe*, 862 F.Supp. 2d 196, 214 (E.D.N.Y. 2012)); *Bryant v. Greater New Haven Transit Dist.*, 8 F.Supp. 3d 115, 129 (D. Conn. 2014) (suspension without pay is an adverse employment action sufficient for a retaliation claim).  Therefore, had the penalty proposed in the NOD been carried out, it would have constituted an adverse action for purposes of Plaintiff's discrimination and retaliation claims.

The threat of disciplinary action, on the other hand, "without more, does not constitute an

adverse employment action." *Campbell v. New York City Transit Auth.*, 93 F.Supp. 3d 148, 169

(E.D.N.Y. 2015) (quoting *Henry v. NYC Health & Hosp. Corp.*, 18 F.Supp. 3d 396, 407

(S.D.N.Y. 2014)).  A notice of discipline that does not create a materially adverse change in

working conditions is not a materially adverse employment action.  *Weeks v. New York State*

*(Div. of Parole)*, 273 F.3d 76, 86 (2d Cir. 2001), *abrogated on other grounds by Nat'l R.R.*

*Passenger Corp. v. Morgan*, 536 U.S. 101 (2002); *Lyman v. NYS OASAS*, 928 F.Supp. 2d 509,

520 (N.D.N.Y. 2013) ("[T]he issuance of a 'counseling memorandum' and a 'notice of

discipline,' without any further evidence regarding a materially adverse effect thereof, is not an

adverse employment action as a matter of law.").  Because there is no record evidence that a

materially adverse employment action was carried out as a result of the August 2, 2013, NOD,

Plaintiff has failed to show a *prima facie* case of discrimination.

   Title VII's anti-discrimination and anti-retaliation provisions "are not coterminous."

*Hicks v. Baines*, 593 F,3d 159, 165 (2d Cir. 2010).  The anti-retaliation protection is broader and,

as noted above, in the context of the anti-retaliation provisions, a materially adverse action is one

that is "harmful to the point that [it] might well dissuade a reasonable worker from making or

supporting a charge of discrimination."  *Burlington N.*, 548 U.S. at 68.  In light of the absence of

any negative consequences as a result of the NOD, the Court finds that a reasonable jury would

not find that a reasonable worker would have been dissuaded from making a charge of

discrimination.  *See, e.g., Harper v. Brooklyn Children's Center*, No. 12-CV-4545 (SJF)(GRB),

2014 WL 1154056, at *4 (E.D.N.Y. March 20, 2014) ("Without more, no reasonable jury could

conclude that two (2) disciplinary citations, i.e., the 2009 NOD charging [plaintiff] with

abandoning his post, violating defendant's Safety Department Policy and Procedure and not

being in uniform while on duty, which was ultimately dismissed, and the November 11, 2009, counseling memorandum addressing an email he sent about an error made during a fire drill, might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'") (quoting *Burlington N.*, 548 U.S. at 68).[14]

In addition, an employer's "enforcement of its preexisting disciplinary policies in a reasonable manner" does not amount to a materially adverse action. *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 26 (2d Cir. 2014). Under the CSEA contract, the unauthorized absence of more than three days but less than eight consecutive workdays is listed as a time and attendance offense, the maximum penalty for which is suspension without pay of three weeks or the equivalent. (Dkt. No. 37-32 at 59.) In her declaration, Johnson stated that similarly situated employees faced the same level of discipline as Plaintiff and submitted an NOD time and attendance, dated December 10, 2014, issued to another employee seeking the same penalty for seven consecutive unauthorized absences. (Dkt. Nos. 37-22 at ¶ 72; 37-46.)

Even if Plaintiff had made a *prima facie* showing of employment discrimination or retaliation, Defendant has submitted evidence showing non-discriminatory reasons for the issuance of the NOD. According to Johnson, the NOD was issued because after being unable to reach Plaintiff by telephone on June 27 and 28, 2013, to tell him to return to work, Sadeckas had written to Plaintiff on June 28, 2013, and informed him that any absence after June 27, 2013, would be considered unauthorized and could result in disciplinary action. (Dkt. Nos, 37-22 at ¶¶

---

[14] Although the test is an objective on, the Court notes that on August 29, 2013, before the NOD was dismissed, Plaintiff filed a retaliation charge with the EEOC based on the August 2, 2013, NOD. (Dkt. No. 37-47.)

57-60; 37-41.)  When Plaintiff called Sadeckas on July 2, 2013, and told him that he would not

be returning to work until July 4, 2013, Sadeckas again told him that his absences would be

unauthorized.  (Dkt. Nos. 37-22 at ¶ 60; 37-83 at ¶ 56.)  The Sadeckas letter was sent and the

telephone conversation occurred prior to the time Plaintiff filed the July 15, 2013, discrimination

lawsuit that Plaintiff claims resulted in the retaliatory issuance of the August 2, 2013, NOD.

Defendant had no way of knowing at the time the NOD was issued that the umpire would

ultimately conclude that Plaintiff's suspension had not ended until July 3, 2013, and the umpire

herself noted the lack of clarity as to Plaintiff's return date.  (Dkt. No. 37-45.)

While the umpire dismissed the August 2, NOD, Plaintiff has submitted nothing more

than inadequate conclusory assertions of race discrimination and retaliation, along with a vague

claim that a white female employee whom he identified constantly missed time from work and,

unlike Plaintiff, was not disciplined, to show pretext.  (Dkt. Nos. 37-21 at 103-04; 43 at ¶¶ 5, 19.)

Moreover, because the evidence establishes that Plaintiff did miss work, and Defendant believed

the absences to be unauthorized prior to receipt of the umpire's decision, the Court finds that a

reasonable jury would not conclude that the August 2, 2013, NOD would not have been issued in

the absence of a retaliatory motive.  *Zann*, 737 F.3d at 846; *see also Ya-Chen*, 805 F.3d at 73.

("Title VII is not an invitation for courts to 'sit as a super-personnel department that re-examines'

employer's judgments.") (quoting *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169 (2d Cir.

2014)(per curiam).                    .

In light of the foregoing, the Court finds that Defendant is entitled to summary judgment

on Plaintiff's race discrimination and retaliation claims asserted with respect to the August 2,

2013, NOD.

## C.     Termination Threat on January 21, 2014

Plaintiff believes that Reed discriminated against him on account of his race and retaliated against him on January 21, 2014, at a meeting during which Reed threatened to fire him, and Plaintiff told Reed he could not fire him.  (Dkt. Nos. 37-21 at 51, 54; 37-49; 43 at ¶¶ 19-20.)  Plaintiff testified at his deposition that he believes that Reed discriminated against him based on his race on Sadeckas' orders because Sadeckas was "not too thrilled" that Plaintiff was coming back to work after the suspension.  (Dkt. No. 37-21 at 52-53.)

Plaintiff filed a grievance claiming that Reed's actions at the January 21, 2014, meeting constituted discrimination and were a retaliating action.  (Dkt. No. 37-49.)  In the decision denying the grievance at Step 1, Johnson wrote that at the meeting Reed had told Plaintiff he was not meeting job expectations, that he could be written up for not performing his duties, and that if problems continued, Reed could seek Plaintiff's termination.  (Dkt. No. 37-50 at 2.)

"The vast majority of courts in this circuit have held that a threat [of termination] alone does not constitute an adverse employment action."  *Tompkins v. Allied Barton Sec. Servs.*, No. 09 Civ. 1954 (RMB)(JLC), 2010 WL 3582627 at *5 n.6 (S.D.N.Y.  Aug. 2, 2010), *report-recommendation adopted*, 2010 WL 3582621 (S.D.N.Y. Sept. 13, 2010), *aff'd*, 424 F. App'x 42 (2d Cir. 2011); *Bowles v. New York City Transit Auth.*, Nos. 00 Civ. 4213, 03 Civ. 3073 (BSJ)(MHD), 2006 WL 1418602, at * 10 (S.D.N.Y. May 23, 2006) (collecting cases and noting that "[i]n this Circuit, most courts that have faced the issue have decided that an unrealized threat of discipline or termination is not actionable under Title VII").

Joining with those courts, the Court finds that there is no evidence that the discussion at the January 21, 2014, meeting constituted a materially adverse employment action.  Furthermore,

at the Step 1 meeting on a February 7, 2014, Plaintiff denied that Reed's threat to fire him was based on any protected category. (Dkt. Nos. 37-22 at ¶ 78; 37-50.) Plaintiff admitted Defendant's statement of material fact regarding that denial. (Dkt. Nos. 37-83 at ¶ 73; 43-1 at ¶ 73.) Moreover, Plaintiff's conclusory assertion that Reed acted in retaliation is wholly unsupported by record evidence and, therefore insufficient to support a retaliation claim based on the meeting.

Based upon the foregoing, the Court finds that Defendant is entitled to summary judgment with regard to Plaintiff's Title VII claim arising out of the January 21, 2014, meeting.

### D.  Placement on Paid Administrative Leave From February 14, 2014, Through May 21, 2014

Plaintiff appears to be claiming that his being placed on paid administrative leave from February 14, 2014, to May 21, 2014, was an act of race discrimination and done in retaliation for having filed race discrimination complaints against Upstate. (Dkt. No. 43 at ¶ 21.) Plaintiff was placed on paid administrative leave following incidents on February 12 and 14, 2014, where he and Reed got into heated disagreements and: (1) Plaintiff spoke disrespectfully to Reed; (2) consistently refused direct orders to sign off on new work instructions, despite being warned by Reed that his failure to do so would result in his being sent home and would be considered insubordination leading to disciplinary action; and (3) mocked Reed on his way out of Reed's office. (Dkt. Nos. 37-21 at 63; 37-58; 37-59; 37-61; 37-62.)

In *Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006), the Second Circuit held that "administrative leave with pay during the pendency of an investigation does not, without more, constitute an adverse employment action." Subsequently, in *Brown v. City of Syracuse*, 673 F.3d

141, 150 (2d Cir. 2012), citing *Joseph*, the Court acknowledged that the rule regarding

suspensions with pay was not "an absolute one," and that a suspension with pay may, in some

circumstances, rise to the level of an adverse employment action."  *Id*.  The Court explained that:

> The relevant question is therefore whether the employer has simply
> applied reasonable disciplinary procedures to an employee or if the
> employer has exceeded those procedures and thereby changed the
> terms and conditions of employment.  Paid suspension during an
> investigation could thus potentially be adverse if the employer
> takes actions beyond an employee's normal exposure to
> disciplinary policies.

*Joseph*, 465 F.3d at 92 n.1.  Plaintiff has failed to provide evidence that he suffered any actions

beyond his exposure to Defendant's normal disciplinary procedures, such as loss of employment

benefits or position during the suspension.  Therefore, the Court finds that Plaintiff has failed to

make a *prima facie* showing of a materially adverse employment action for either his race

discrimination or retaliation claims.

Even if Plaintiff had satisfied the requirements for a *prima facie* showing of race

discrimination or retaliation, Defendant has provided evidence showing non-discriminatory

reasons for the administrative paid leave.  There is clear evidence that Plaintiff violated The

Upstate Pledge: A Code of Conduct and Mutual Respect, which he had signed, in his dealings

with Reed.  (Dkt. No. 37-24.)  Reed claims Plaintiff used, and Plaintiff has largely admitted to

using foul or abusive language, and Plaintiff displayed rude, disrespectful and dismissive

behavior towards Reed, including mocking him on February 12 and 14, 2014, leading up to the

suspension.  *Id*.; Dkt. Nos.  37-21 at 63; 37-58; 37-59; 37-61; 37-62.  Plaintiff has provided no

evidence of pretext with respect to his race discrimination claim, or any evidence that the

allegedly adverse action would not have occurred in the absence of a retaliatory motive with

regard to his retaliation claim.

Based upon the foregoing the Court finds that Defendant is entitled to summary judgment on Plaintiff's discrimination and retaliation claims arising out of being placed on administrative leave with pay from February 14, 2014, through May 21, 2014.

### E.    Civil Service Law § 72 Medical Examination

Plaintiff claims that Upstate's action in requiring him to undergo an examination with a psychiatrist in April 2014 pursuant to Civil Service Law § 72 constituted both race discrimination and retaliation for filing discrimination complaints.  (Dkt. Nos. 37-21 at 106-07 43 at ¶¶ 17, 19.)  The psychiatrist who performed the examination found Plaintiff fit for work, and Plaintiff has submitted no evidence that the examination resulted in a materially adverse change in the terms and conditions of Plaintiff's employment for purposes of making a *prima facie* showing of race discrimination.  *See Mathirampuzha*, 548 F.3d 70.  Moreover, Plaintiff's claim that requiring him to undergo the examination constituted race discrimination is unsupported by non-conclusory evidence in the record.

In *Flynn v. New York State Div. of Parole*, 620 F.Supp. 2d 463, 495 (S.D.N.Y. 2009), the Court found a material issue of fact on summary judgment on Plaintiff's retaliation claim with respect to whether a reasonable employee would be dissuaded from complaining about discrimination by the prospect of undergoing a fitness for duty examination under § 72. However, even assuming the § 72 examination constituted an adverse action for purposes of Plaintiff's retaliation claim, Plaintiff has offered no evidence tending to show that the examination would not have occurred in the absence of retaliatory motive.  *See Zann*, 737 F.3d at 846.  In fact, the record evidence shows non-discriminatory reasons for requesting the

examination, including concern about Plaintiff's mental well-being, inappropriate communication/behavior, and ability to perform his work related duties in a workplace that had to remain free of violence. (Dkt. No. 37-22 at ¶ 126.) Included in the request for the examination was reference to the note placed in a co-worker's locker on July 1, 2012; Plaintiff's written complaint accusing Maguire and employee M.F. of rape; the December 14, 2013, incident with M.F. regarding the privacy screen; the meeting between Plaintiff and Reed on January 21, 2014; Plaintiff's meeting with Reed and Eck on February 12, 2014, regarding the new system; and Plaintiff's February 14, 2014, meeting with Reed. (Dkt. No. 63.)

Given the absence of any non-conclusory evidence of race discrimination, the strong evidentiary showing by Defendant that there were non-retaliatory reasons for requesting the examination, and Plaintiff's failure to submit evidence tending to show that the examination would not have occurred in the absence of retaliatory motive, the Court finds that Defendant is entitled to summary judgment on Plaintiff's discrimination and retaliation claims regarding the § 72 examination.

**F.      May 21, 2014, NOD**

Plaintiff claims that the May 21, 2014, NOD constituted both race discrimination and retaliation for his filing of discrimination claims. (Dkt. Nos. 37-21 at 77-79; 43 at ¶¶ 17,19.) The May 21, 2014, NOD, which proposed termination of Plaintiff's employment on June 4, 2014, listed Plaintiff's misconduct as including the privacy screen incident and verbal altercation with M.F. on December 14, 2013[15]; the incident with Reed and Eck on February 12, 2014,

---

[15]  As noted above, M.F., who is Caucasian, was also served with an NOD recommending termination as a result of the incident. (Dkt. No. 37-56.) According to Johnson, another similarly situated employee also faced the same level of disciplinary action. (Dkt. Nos. 37-22 at

involving the Igotit training; and the incident with Reed on February 14, 2014, when Plaintiff

was suspended with pay. (Dkt. No. 37-51.) As with the August 2, 2013, NOD, Plaintiff filed a

grievance after receiving the May 21, 2014, NOD. (Dkt. No. 37-52.) As a result, Plaintiff was

not terminated as proposed in the May 21, 2014, NOD, and ultimately no action was taken with

respect to the grievance or the NOD. (Dkt. No. 37-21 at 72.) Plaintiff continued to work in his

same position after issuance of the NOD. *Id.*

Because the May 21, 2014, NOD did not create a materially adverse change in the terms

and conditions of Plaintiff's employment, he has failed to make a *prima facie* showing of a

materially adverse employment action for purposes of his race discrimination claim. *See Weeks*,

273 F.3d at 86. The Court also finds that given the absence of consequences from the May 21,

2014, NOD, a reasonable jury would not find that the NOD would have dissuaded Plaintiff from

making or supporting a charge of discrimination. *See Harper,* 2014 WL 1154056, at *4.

Even if Plaintiff could be found to have made the requisite *prima facie* showing with

regard to his race discrimination and retaliation claims, the record evidence of Plaintiff's

unacceptable conduct in the incidents referenced in the NOD reveals a non-discriminatory basis

for its issuance. While Plaintiff has claimed in conclusory fashion that he was treated differently

than a white employee with regard to the NOD because of his race (Dkt. No. 43 at ¶ 19), he has

failed to present any non-conclusory evidence that the issuance of the May 21, 2014, NOD took

place under circumstances giving rise to an inference of race discrimination. *See Holcomb,* 521

F.3d at 137; *Bickerstaff* , 196 F.3d at 456 (holding that plaintiff's feelings and perceptions of

¶ 89; 37-36 at 2.)

being discriminated against are not evidence of discrimination).  Furthermore, Plaintiff has failed

to submit evidence showing that the NOD would not have been issued in the absence of a

retaliatory motive.  (Dkt. No. 37-51.)  *See Zann*, 737 F.3d at 846.

Therefore, the Court finds that Defendant is entitled to summary judgment on Plaintiff's

race discrimination and retaliation claims regarding the May 21, 2014, NOD.

### G.      June 13, 2014, Formal Counseling Memorandum

Plaintiff claims that the June 13, 2014, formal counseling memorandum regarding

Plaintiff's time and attendance from October 1, 2013, through May 23, 2014 (Dkt. No. 37-67),

constituted race discrimination and retaliation for filing an EEOC complaint in August 2013.

(Dkt. Nos. 37-21 at 73-77; 43 at ¶¶ 17-19.)  Plaintiff was not disciplined as a result of the June

13, 2014, formal counseling memo and has produced no evidence showing a materially adverse

effect on the terms and conditions of his employment as a result of the memo.  (Dkt. No. 37-21 at

77.)

In *Weeks*, 273 F.3d at 86, the Second Circuit, in finding that a counseling memorandum

does not constitute an adverse employment action, wrote that "[i]t hardly needs saying that a

criticism of an employee (which is part of training and necessary to allow employees to develop,

improve and avoid discipline) is not an adverse employment action." *See also St. Juste v. Metro*

*Plus Health Plan,* 8 F.Supp. 3d 287, 307 (E.D.N.Y. 2014) ("[E]ven if Plaintiff is correct that the

counseling memorandum was unjustified, such a counseling memorandum, standing alone, does

not constitute an adverse employment action."); *Morales v. NYS Dept. of Labor*, 865 F.Supp. 2d

220, 244 (N.D.N.Y. 2012) ("[T]he issuance of a 'counseling memorandum' . . . without any

further evidence regarding a materially adverse effect thereof, is not an adverse employment

action as a matter of law") *aff'd*, 530 F. App'x 13 (2d Cir. 2013). Furthermore, the Court finds

that a reasonable jury could not conclude that a counseling memorandum, without more, might

have dissuaded a reasonable worker from making or supporting a charge of discrimination, *see*

*Harper,* 2014 WL 1154056, at *4.

Therefore, the Court finds that Defendant is entitled to summary judgment on Plaintiff's

claims of race discrimination and retaliation with regard to the June 13, 2014, formal counseling

memorandum.

### H.    September 22, 2014, Verbal Dispute with Reed

Plaintiff also claims that during their verbal dispute on September 22, 2014, Reed

discriminated against him by engaging in racial bullying and in retaliation for his filing of

discrimination claims. (Dkt. Nos. 37-21 at 93-94; 43 at ¶¶ 17,19.) The verbal dispute occurred

when Reed called Plaintiff into his office and asked Plaintiff why he disrespected him by walking

right by Reed and his co-workers every day without saying anything to anyone. (Dkt. No. 37-21

at 80-82.) According to Plaintiff, the situation escalated, with Reed becoming frustrated and

raising his voice and ultimately coming close to Plaintiff and kicking a trash can and yelling at

Plaintiff to get out of his office. *Id*. at 82-84. The escalation began when Plaintiff indicated to

Reed that there was a problem between the two of them; suggested that the solution was for them

not to speak to one another; and told Reed that he had been treating him like crap and trying to

fire him from the beginning. *Id*. Plaintiff claims that during the conversation, Reed told Plaintiff

that he was not a man, that he knew everything and always had an answer for everything. *Id*. at

84.

According to Reed, when he called Plaintiff into his office he asked if everything was

okay and what was going on and said he was asking because he said hello to Plaintiff every day and asked him how he was doing, and Plaintiff never responded. (Dkt. No. 37-81.) Plaintiff called Reed a bully. *Id.* A statement prepared by Reed indicates he told Plaintiff he was not a bully but held Plaintiff to the same standards and accountability as other employees. *Id.* Reed admitted to telling Plaintiff to get out of his office after a twenty-five to thirty minute conversation in which Plaintiff was argumentative with regard to everything Reed said. *Id.*

"Excessive scrutiny, criticism, and negative evaluation of an employee's work are not materially adverse employment actions unless such conduct is "accompanied by negative consequences, such as demotion, diminution of wages, or other tangible loss." *Opoku v. Brega*, No. 15-CV-2213 (KMK), 2016 WL 5720807, at * 7 (S.D.N.Y. Sept. 30, 2016); *see Jaeger v. N. Babylon Union Free Sch. Dist.*, 191 F.Supp. 3d 215, 226 (E.D.N.Y. 2016) ("[C]riticism of an employee in the course of evaluating and correcting [his or] her work is not, in itself, a materially adverse employment action.") (internal quotation marks omitted); *Abraham v. Potter*, 494 F.Supp. 2d 141, 147 (D. Conn. 2007) ("[R]eprimands threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation.").

Plaintiff was being treated for anxiety and depression prior to the September 22, 2014, dispute with Reed and continued treatment and was diagnosed with PTSD thereafter. (Dkt. No. 37-21 at 87-88.) "Although reprimands and close monitoring may cause an employee embarrassment or anxiety, such intangible consequences are not materially adverse alterations of employment conditions." *Castro v. N.Y.C. Bd. of Educ. Personnel*, No. 96-CV-6314 (MBM), 1998 WL 108004, at * 7 (S.D.N.Y. Mar. 12, 1998). Furthermore, Plaintiff's own description of

the verbal disagreement shows that the negative comments came largely from Plaintiff himself. (Dkt. No. 37-21 at 81-84.)  Based on the foregoing, the Court finds that Plaintiff has failed made a *prima facie* showing that his verbal dispute with Reed constituted a materially adverse employment action.

Reed's statement indicating that he called Plaintiff into his office to ask if everything was okay because he said hello to Plaintiff every day and asked him how he was doing, and Plaintiff never responded, provides evidence of a non-discriminatory reason for initiating the meeting. (Dkt. No. 37-81.)  By Plaintiff's own admission, the meeting became hostile largely as a result of his own statements.  (Dkt. No. 37-21 at 82-85.)  Plaintiff has offered no non-conclusory evidence that would permit a reasonable jury to infer that the discussion was more likely than not based in whole or in part on discrimination, or that it would not have occurred in the absence of a retaliatory motive.

In light of the foregoing, the Court finds that Defendant is entitled to summary judgment with regard to Plaintiff's race discrimination and retaliation claims arising out of the September 22, 2014, verbal disagreement between Plaintiff and Reed.

## I.      Termination of Plaintiff's Employment

Plaintiff never returned to work after leaving on September 22, 2014, and his employment was ultimately terminated.  (Dkt. Nos. 37-76; 37-77.)  At his deposition, Plaintiff testified that the termination was "in retaliation for    if you're    if    if they can get away with firing, then there's other grievances that don't have to be answered, so the motive is also get rid of    get rid of him as soon as you can, if an opportunity comes up, then do it."  (Dkt. No. 37-21 at 96.)  Plaintiff also claims in conclusory fashion that his employment was terminated because he was

treated "in a materially and objectively worse manner" than someone who is white.  (Dkt. No. 43 at ¶ 19.)

There is no question but that termination of employment is a materially adverse employment action for purposes of a race discrimination or retaliation claim under Title VII.  *See Humphries v. City Univ. of N.Y.*, No. 13-CV-2641 (PAE), 2013 WL 6196561, at * 7 (S.D.N.Y. Nov. 26, 2013) (describing termination as the "quintessential materially adverse employment action").   However, Defendant has provided a non-discriminatory reason for the termination, and Plaintiff has failed to show it is pretext or that the termination would not have happened absent a retaliatory motive.

Civil Service Law § 73 provides authorization to terminate the employment status of an employee who has been absent from work and unable to perform his duties for one year or more by reason of a disability.  Johnson has made the unrefuted statement in her declaration that "Plaintiff was not treated any different[ly] because of his race and was not retaliated against," and that he was terminated in accordance with Civil Service Law § 73 because he had been out of work for a year.  (Dkt. No. 37-22 at ¶¶ 156-57.)  Johnson further stated that § 73 had been applied to similarly situated individuals.  *Id*. at ¶ 157.  Plaintiff has admitted Defendant's material statements of fact regarding the basis for his termination and the routine application of § 73 to other similarly situated Upstate employees.  (Dkt. Nos. 37-83 at ¶¶ 154-55; 43-1 at ¶¶ 154-55.)

Therefore, the Court finds that Defendant is entitled to summary judgment on Plaintiff's race discrimination and retaliation claims arising out of the termination of his employment.

**J.      Consideration of Alleged Acts of Retaliation in the Aggregate**

As noted above, alleged acts of retaliation must be evaluated both separately and in the

aggregate. *See Tepperwien*, 663 F.3d at 569. The Court has analyzed each alleged act separately.

Based on that analysis the Court concludes that evaluation in the aggregate would do nothing to

change the outcome because each retaliation claim in which the Court has found that Plaintiff

failed to make a *prima facie* showing of a materially adverse action, it has also concluded that

Plaintiff failed to show that the adverse action would not have occurred absent a retaliatory

motive.

**VII.    CONCLUSION**

Based upon the foregoing, the Court finds that Defendant is entitled to summary

judgment.

**ACCORDINGL**Y, it is hereby

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 37) is

**GRANTED**; and it is further

**ORDERED** that the Clerk of the Court shall enter judgment in Defendant's favor and

close this case.

**IT IS HERE ORDERED.**

Dated:  March 17, 2017
        Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge